The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.





Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| STEVEN D. LABOLT AND | ) | CASE NO. 08-64428 |
| KIMBERLY A. LABOLT, | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtors. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT INTENDED FOR** |
| | ) | **PUBLICATION)** |

Now before the Court is the United States Trustee's (hereafter "UST") motion to dismiss Debtors' case pursuant to 11 U.S.C. § 707(b)(1) and (3). The motion was filed on April 27, 2009. The Court conducted an evidentiary hearing on September 10, 2009. Both parties submitted post-hearing briefs.

Jurisdiction is premised in 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. In accordance with 28 U.S.C. § 1409, venue in this district and division is proper. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The following Memorandum of Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. In rendering its decision, the Court has considered the testimony of witnesses and the exhibits admitted into evidence during the hearing.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

1

## FACTS

On December 30, 2008, Debtors filed a joint chapter 7 case. At the time of the filing, Debtor Steven LaBolt was employed with Bronx/Taylor-Wilson. Mr. LaBolt remained employed with Bronx/Taylor-Wilson ("Bronx") at the time of the hearing, earning approximately $90,000.00 per year as a gross salary. Although he is an engineer by training, his title at Bronx is "project engineer." He has been stationed in China for the last four months overseeing two projects for his employer. Debtor Kimberly LaBolt was employed part-time as a waitress for Palumbo's restaurant. According to Schedule I, she earns approximately $85.00 per week net. Debtors have two teen-aged children. The parties do not dispute that Debtors' income is above the median income for a family of four in the state of Ohio.[1]

In their petition, Debtors listed ownership interests in several business entities, all listed as property of Debtor Steven LaBolt. The entities include AFD; K-Bolt; LaBolt Trucking, LLC; Pete Logistics, LLC; and KMC International, LLC ("KMC). AFD, Inc. was formed to design and build industrial furnace equipment for the steel industry and is no longer operating. K-Bolt was created to design and build mechanical equipment for the steel industry and has not operated in approximately three years. LaBolt Trucking, LLC was formed as an over-the-road freight hauling business. It operated approximately two years and ceased operations in October 2008, reportedly as a result of rising fuel prices. Pete Logistics, LLC is a freight broker and arranges shipment of freight between parties. It currently has one client, Debtor's employer Bronx, has not moved a load for Bronx since March 2009, and has no current income.

The only active company, KMC, was formed to execute a contract for a former client of AFD following the cessation of operations of AFD and K-Bolt. KMC contracted to design and build two industrial furnaces. KMC continues work under the contract and is receiving progressive, milestone-based payments. According to Debtor Steven LaBolt, $50,000.00 remains to be billed and that $60,000.00 to $70,000.00 is owed. KMC subcontracted most of the work on the project. There may be additional payments from extras that were not part of the contract, but these reimbursements have not been discussed with the client. Regardless of whether additional monies are received, it is unlikely that Debtors will show a net profit for the remaining portion of the project.

On the means test, Debtors disclosed no income from any of these entities in the six months prior to the filing of the case. According to Schedule I, however, Debtors were receiving approximately $778.00 per month from KMC and $280.00 per month

---

[1] The Court notes that the means test filed with the petition indicates that the applicable family median income is $50,965.00. The Court finds this to be inaccurate: this is the median income for a family of two, not four. The median income for a family of four at the time the case was filed was $71,489.00.

08-64428-rk    Doc 52    FILED 01/13/10    ENTERED 01/13/10 13:41:35    Page 2 of 9

from Pete Logistics. At the hearing, Debtor disclosed that the income from Pete Logistics was probably higher than disclosed in Schedule I based on the amount of transfers of funds from Pete Logistics to Debtors personally to assist with payment of personal household expenses, including mortgage payments.

In addition to the business assets, Debtors own real estate at 10780 Mogadore Avenue in Uniontown, Ohio. The value of the property, per Schedule A, is $285,400.00. The property was purchased in 2004 for $275,000.00 or $278,000.00. In 2008, the property was appraised for $310,000.00 by Charles L. Cather, SRA with Barry R. Ankney, Inc. by FirstMerit for the purpose of a loan restructuring.

Debtor Steven LaBolt testified that there are five mortgages on the property. According to Debtor Steven LaBolt, the first mortgage, with an approximately balance of $210,000.00, is held by Wells Fargo and has a monthly payment of approximately $1,368.00. The remaining mortgages are held by FirstMerit. The second mortgage secures an AFD line of credit on which Debtors owe approximately $85,533.99, per a proof of claim filed on July 22, 2009. The monthly payment is $1,991.00. The third mortgage secures a debt related to K-Bolt, with a balance of $20,118.12, per proof of claim number seven. The payment is $481.00, as identified in Schedule I. Debtors are attempting to service the first three mortgages. To meet these obligations, Debtors have used funds from the businesses, both pre- and post-petition. The payment amounts on the mortgages do not include taxes or insurance.

Debtors are currently not paying the remaining two mortgages. The underlying debts for these mortgages resulted from (1) a construction loan for a two thousand plus square foot workshop built in 2005, and (2) the refinancing of a mortgage held by Fifth Third on a home equity line of credit. According to the proofs of claim eight and nine filed by FirstMerit, the balances on these mortgages total in the neighborhood of $120,000.00. The payment amounts are not known. None of the mortgage debt was reaffirmed by Debtors.

On Schedule B, Debtors disclosed personal assets valued at $119,234.00. Included are 401(k) and IRA funds totaling $72,134.00. With the exception of Pete Logistics, whose value is listed as "unknown," the businesses are valued at zero. Debtors list ownership interests in four vehicles: a 1999 Volkswagen Beetle with a value of $2,375.00; a 1980 bulldozer valued at $500.00; a 2002 Chevrolet Tahoe valued at $8,000.00; and a 2005 Ford F350, valued at $20,500.00. According to Schedule D, the Debtors owe $6,200.00 on the Tahoe; $23,200.00 on the F350. The Beetle is owned outright. At the hearing, Debtors disclosed that they also have use of a 2006 or 2007 Volkswagen Jetta which is owned outright by Pete Logistics. The payments on the F350 are $744.38 per month as set forth in a reaffirmation agreement filed on February 18, 2009. None of the other secured obligations were reaffirmed.

Debtors' listed $321,423.65 in unsecured debt on Schedule F. Less than $4,000.00 appears to be for medical-related debt; approximately $100,000.00 are personal loans from individuals. The remainder is credit card debt and personal loans.

Debtors' expenditures on Schedule J include total utilities of $475.00 (electricity, heating fuel, water, sewer, telephone and cable); $600.00 in grocery expenses, $240.00 per month in medical expenses, $600.00 per month in transportation expenses, $175.00 for home and automobile insurance, and $370.00 per month for real estate taxes.

## **LAW AND ANALYSIS**

The bankruptcy code grants a bankruptcy court authority to dismiss a case when it determines that granting a discharge would be an abuse of the bankruptcy system. 11 U.S.C. § 707(b)(1). As an alternative to dismissal of an abusive case, a bankruptcy court has the option of conversion when a debtor consents. Id. Sections 707(b)(2) and (b)(3) address what constitute abusive filings. Under section 707(b)(2), the calculations from the means test can create a presumption of an abuse. In this case, the section 707(b)(2) presumption of abuse did not arise, leaving section 707(b)(3) to govern whether this case represents an abuse of the bankruptcy system.

Under 11 U.S.C. § 707(b)(3), abuse is predicated on one of two foundations: bad faith or the totality of the circumstances. See 11 U.S.C. § 707(b)(3)(A) and (B). UST's motion is grounded in an argument that the totality of the circumstances demonstrates abuse. According to the UST, looking at Debtors' situation as a whole, Debtors' filing indicates both a lack of honesty and a want of need. These two descriptors of abuse were set forth in cases discussing "substantial abuse" prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act. See Behlke v. Eisen (In re Behlke), 358 F.3d 429 (6th Cir. 2004); In re Krohn, 886 F.2d 123 (6th Cir. 1989)). These considerations remain the touchstones for determining abuse under 11 U.S.C. § 707(b)(3). See Moutousis v. U.S. Trustee (In re Moutousis), 418 B.R. 703 (E.D. Mich. 2009); In re Phillips, 417 B.R. 30 (Bankr. S.D. Ohio 2009). In order to succeed on its motion, UST carries the burden of persuasion under one of these foundations by a preponderance of the evidence. See In re Beckerman, 381 B.R. 841 (Bankr. E.D. Mich. 2008); In re Gonzalez, 378 B.R. 168 (Bankr. N.D. Ohio 2007) (citation omitted).

In expounding on the considerations for determining whether abuse exists, the Sixth Circuit advised that an honest debtor is one whose dealings with creditors is "marked by essentially honorable and undeceptive dealings." In re Behlke at 433 (quoting In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989)). Recognizing that a myriad of factors exist by which a debtor's honesty may be tested, the Sixth Circuit specifically identified several considerations, including a "debtor's good faith and candor in filing schedules and other documents, whether he has engaged in 'eve of bankruptcy purchases,' and whether he was forced into Chapter 7 by unforeseen or catastrophic

4

events." Krohn at 126.

Looking first at Debtors' disclosures, the Court notes that scattered misstatements in the petition and schedules exist. After considering the testimony of Debtor Steven LaBolt, the Court is convinced that the business income was not accurately listed on the means test or on Schedule J. Additionally, the valuations of Pete Logistics and KMC on Schedule B are suspect. For example, during the evidentiary hearing, Debtor Steven LaBolt disclosed that Pete Logistics owns a vehicle outright which Debtors use for personal purposes, a fact that was not readily apparent from the petition and schedules. He also discussed KMC's work under a contract, including its right to collect on additional progress payments. Although the Court will not characterize the misstatements as intentionally dishonest, they do suggest a less than full or forthright disclosure.

Turning to the next second identified factor for consideration by the Sixth Circuit, the Court finds that Debtors' "eve of bankruptcy" lifestyle is problematic. On May 28, 2008, approximately eight months before filing a chapter 7 petition, both Steven and Kimberly LaBolt signed documents restructuring debts owed to FirstMerit. *See* Proof of Claim 6-1. On page five of that loan restructuring agreement, paragraph (d), the agreement references an anticipated chapter 13 filing by the Debtors. Id. Clearly, Debtors were contemplating a bankruptcy filing in May 2008. In spite of this, Debtors spent significant amounts of money in May and the subsequent months, well above and beyond the $7,405.00 in average monthly expenditures identified in Schedule J. *See* UST Exh. 5. According to Exhibit 5, Debtors' average monthly spending from January 1, 2008 to February 10, 2009 was $10,091.00 per month. This amount is also well in excess of the $7,337.00 monthly net income identified by Debtors on Schedule I and the $7,955.00 current monthly income figure calculated on the means test. It is apparent that Debtors' average monthly spending significantly exceeded their average monthly income even after they knew bankruptcy was imminent. While it is not clear whether Debtors were using credit to cover expenses above and beyond their income, or whether their income was higher than reported, what actually happened is immaterial: the problem is that Debtors continued on a path of high living to the very eve of filing.

Not only are the amounts of overall expenditures troubling, but there are multiple individual expenses that raise serious questions and impugn the honesty and good faith of Debtors. Exhibit six suggests a pattern of persistent spending. Particularly troubling for the Court are the untraceable amounts of cash withdrawn. Looking at the May 10, 2008 to June 10, 2008 bank statement, the period covering the time Debtors signed the loan restructuring documents, over $1,300.00 was taken in ATM withdrawals. Over $300.00 was withdrawn on two separate dates, May 23, 2008 and June 2, 2008, from an ATM in Mountaineer, WV. Additionally, in the "Other Withdrawals" section, another $1,413.00 was taken from the account. On this bank statement, it appears almost $3,000.00 was spent without account. The following bank statement, for the period dated June 11, 2008 to July 10, 2008, Debtors appear to have transferred funds from an overdraft line to cover

5

the expenditures. *See* Exhibit 6-33. This is yet another indication that Debtors' spending was excessive.

The Court questions where the cash was spent. The bank account statements include debit expenses for typical cash transactions, including groceries, dining out, clothing, transportation and recreation in amounts above the budget amounts in Schedule J. To illustrate its point, the Court will compare budget items prepared by Debtors (Schedule J) with the UST analysis prepared from Debtors' bank account:

|  | Schedule J | Exhibit 5 (averages) |
|---|---|---|
| Food | $600.00 | $564.00 (dining out) |
|  |  | $498.00 (groceries) |
| Recreation | $100.00 | $1,275.00 |
| Gasoline/Transp. | $600.00 | $744.00 |
| Clothing | $100.00 |  |
| Laundry/Dry Cleaning | $40.00 |  |
| Home Maintenance | $120.00 | $1,200.00 (Other household purchases) |

The amounts set forth above from Exhibit 5 are exclusive of cash advances: the averages represent only the debt purchases at identified vendors. Consequently, in addition to the prodigious spending detailed through Exhibits 5 and 6, Debtors also spent, on average, $744.00 from cash withdrawals.[2]

Debtors' spending was unabated, even after executing the loan restructuring documents. On July 11, 2009, Debtors deposited in excess of $18,000.00 in tax refunds in their bank account. Exhibit 6-39. The next bank statement shows ATM withdrawals in Mountaineer, WV; a Hotwire purchase, an Nwa Air purchase, as well as various purchases in Florida, including what appear to be baseball tickets, other recreational activities, hotel and car rentals and parking fees, and a purchase at the Wendy's concourse in Atlanta, GA. On August 13, 2008, there is a $503.54 purchase identified as "Z602 Vcn*ky Trans Cabinfrankfort, KY", followed by a $500.00 "purchase" identified as Cash Pnc Bank Cashwashington DC, followed by a $400.00 ATM withdrawal of Cash in North Canton. On August 18, 2008, $930.17 was spent at the Flamingo Hotel in Las Vegas. Between August 14, 2008 and August 18, 2008, over $1,700.00 cash was withdrawn in Las Vegas. On August 25, 2008, another $200.00 was withdrawn in Mountaineer, WV. Debtors obtained their credit counseling certificate from Alliance Credit Counseling on

---

[2] The Court does recognize that Debtors' spending decreased in the two months post-petition.

08-64428-rk    Doc 52    FILED 01/13/10    ENTERED 01/13/10 13:41:35    Page 6 of 9

December 24, 2008. Docket #2. Five days later, over $300.00 was withdrawn in cash in Mountaineer, WV. The spending continued rampantly.

Another concern for the Court is the absence of payments to creditors. The bank account statements in Exhibit 6 show that mortgage payments and utility payments, including Dominion (gas), Ohio Edision (electric), Directv (satellite TV), and AT&T, were paid from Debtors' bank account. However, there are no payments to unsecured creditors. Debtors spent thousands of dollars, including over $17,000.00 in tax refunds, yet the Court cannot locate a payment to an unsecured creditor.

Debtors' filing was not the result of a catastrophic event. Although Debtor cites two factors which forced his businesses to cease operations, including a downturn in the steel industry and rising fuel prices, these were separate and distinct pressures exacerbating existing financial strains on Debtors. Debtors were overextended before the trucking business failed and continued to live beyond their means after its demise. The result was catastrophic, leaving Debtors with an over-encumbered home and unsecured debt exceeding $300,000.00. Debtors' misstatements, their eve of bankruptcy spending, and the absence of a catastrophic event in their lives demonstrate an absence of legally cognizable necessity in filing bankruptcy.

In determining whether an bankruptcy filing is abusive, a Court can also consider whether there is a want of need by a debtor. A "needy" debtor is one whose "financial predicament warrants the discharge of his debts in exchange for liquidation of his assets." Behlke, 358 F.3d at 434 (quoting Krohn, 886 F.2d at 126). Identified considerations for determining whether a debtor is needy include whether a debtor has an

> ability to repay his debtors out of future earnings . . . whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expense can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

Krohn at 126.

The Court finds Debtors' post-petition actions evidence a want of need, as well as a lack of good faith. The chief indicator is Debtors' retention of their severely over-encumbered and unaffordable residential real estate. The real estate is valued between $285,000.00 and $310,000.00 and the five existing mortgages on the property total in excess of $435,000.00. Debtors admitted that they cannot service the entire mortgage debt, so they have only been paying the first three mortgages, and even needed assistance

from the businesses to maintain those payments. The payments on the three mortgages are in the neighborhood of $3,840.00 per month. The IRS standards for a mortgage expense for a family of four at the time this case was filed was $872.00, almost $3,000.00 less than the amount spent by Debtors. Although Debtors did not reaffirm the mortgage debts, they gave no indication of a willingness or desire to surrender the home. There was no reasonable explanation for knowingly maintaining payments on the first three mortgages with no plan for payments on the remaining two mortgages. A reduction in mortgage/rent expense would clearly provide an opportunity for repayment of a portion of the amounts owed by Debtors. The attempt to maintain the residence is indicative of a want of need.

Additionally, Debtors have reaffirmed a $22,000.00 plus debt on a 2005 Ford F350 truck. Payments on the truck are $744.38. The Court finds this to be another improvident expense. Debtor Steven LaBolt testified that he needed it for the work he was doing because a four-door car was not suitable for his purposes. However, his testimony also establishes that his businesses are no longer operating. At the time of the hearing, he was working in China, so the truck was not being used for work purposes. Further, he testified that his wife didn't like to drive the truck. Thus, the continued to utility of the truck is puzzling.

Mr. LaBolt is obviously skilled. He earns an income above the median income. Although he testified that his employer had seen a downturn in contracts and business, Mr. LaBolt did not identify an immediate threat to his job. Therefore, the Court concludes that Debtors do have a stable source of future income. No one has challenged Debtors ability to obtain relief in chapter 13. The Court does recognize that Debtors attempted to work with FirstMerit through the loan restructuring dated May 2008. It is not apparent what type of relief other negotiations might provide, so the Court cannot weigh this factor in either direction. Debtors expenses can certainly be reduced from their pre-filing levels. Any combination of a reduction in spending, surrender of the secured real estate, or surrender of the truck would provide funds for Debtors to fund a chapter 13 plan.

## CONCLUSION

Looking at the totality of the circumstances, the Court concludes that Debtors have a "want of need" of the relief sought. Debtors have not demonstrated either honesty or neediness with this filing. Consequently, the Court cannot but conclude that Debtors' filing constitutes an abuse of the bankruptcy system.

An appropriate order will be entered reflecting the decision of the Court.

# # #

8

## SERVICE LIST

Michael J Moran
Gibson & Lowry
PO Box 535
234 Portage Trail
Cuyahoga Falls, OH 44222

Scott R. Belhorn
Office of the US Trustee
Howard M. Metzenbaum U.S. Court House
201 Superior Avenue, Suite 441
Cleveland, OH 44114-1240